January 3, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

Nos. 93-2374
94-1128
94-1129

JAY A. PRITZKER,
Plaintiff, Appellee,

v.

BOB YARI, ET AL.,
Defendants, Appellants.

ERRATA SHEET ERRATA SHEET

The opinion of the court issued on December 13, 1994, is
corrected as follows:

On page 38, line 11, change "Words of Days" to "Works and
Days". 

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Nos. 93-2374
94-1128
94-1129

JAY A. PRITZKER,
Plaintiff, Appellee,

v.

BOB YARI, ET AL.,
Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Selya and Cyr, Circuit Judges,
and Zobel,* District Judge.

Roger R. Crane, with whom Bachner, Tally, Polevoy & Misher,
Roberto Boneta, Munoz Boneta Gonzalez Arbona Benitez & Peral,
Jose Trias-Monge, and Trias & Melendez were on brief, for
defendant Bob Yari.
Martin I. Kaminsky, with whom W. Hans Kobelt and Pollack &
Kaminsky were on brief, for defendant Baird, Patrick & Co.
Benjamin Rodriguez-Ramon, Rodriguez-Ramon & Rodriguez-
Hernandez, and Emigdio R. Seles on brief for defendant Lincoln
Realty, Inc.
Ruben T. Nigaglioni, with whom Diana Mendez-Ondina and
Ledesma, Palcu & Miranda were on brief, for defendant Paul S.
Dopp.
Gael Mahony, with whom Frances S. Cohen, David A. Hoffman,
Joshua M. Davis, Hill & Barlow, Salvador Antonetti-Zequeira,
Ricardo Ortiz-Colon, and Fiddler, Gonzalez & Rodriguez were on
brief, for plaintiff Jay A. Pritzker.

December 13, 1994

*Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. In this troika of appeals, we SELYA, Circuit Judge.

address several questions arising collaterally from a bitterly

fought breach-of-contract suit between Paul S. Dopp and Jay A.

Pritzker (the D/P Litigation) concerning the ownership of two

hotels, situated on approximately 1,000 beachfront acres, in the

Commonwealth of Puerto Rico. The engine of high-stakes

litigation runs on money, and at various times during the course

of the D/P Litigation Dopp forged financing agreements with three

different financiers, namely, Bob Yari, Lincoln Realty, Inc.

(Lincoln), and Baird, Patrick & Co. (BPC), for the apparent

purpose of fueling his prosecution of the suit.

Although we first must address BPC's jurisdictional

challenge, our principal task today is to resolve the contested

legal status of these financing agreements. Having carefully

examined the relevant law and the facts of the case, we hold that

all three financing agreements involve "litigated credits" within

the meaning of article 1425 of the Civil Code of Puerto Rico,

P.R. Laws Ann. tit. 31, 3950 (1991); that all are, therefore,

subject to redemption by Pritzker under Puerto Rico law; and that

Pritzker properly perfected his rights to redemption. We also

hold that the lower court's trimming of Pritzker's right to

redeem Yari's litigated credit lacked any legal basis.

Consequently, we affirm in part and reverse in part.

I. BACKGROUND I. BACKGROUND

The facts relating to the underlying breach of contract

and the protracted litigation emanating from it are chronicled in

3

a series of opinions, see Dopp v. Pritzker, F.3d , 

(1st Cir. 1994) [Nos. 93-2373, 94-1130, & 94-1131, slip op. at 3-

6]; (Dopp IV); Dopp v. HTP Corp., 947 F.2d 506, 508-09 (1st Cir.

1991) (Dopp II); Dopp v. HTP Corp., 831 F. Supp. 939, 941-92

(D.P.R. 1993) (Dopp III); Dopp v. HTP Corp., 755 F. Supp. 491,

492-94 (D.P.R. 1991) (Dopp I), and need not be rehearsed. Hence,

we confine our account to the facts that are needed to place the

instant appeals into workable perspective.1

A. The Financing Agreements. A. The Financing Agreements.

In March 1990, a jury sitting in the United States

District Court for the District of Puerto Rico found Pritzker

liable to Dopp in the sum of $2,000,000 for breach of an oral

contract concerning the purchase of the Dorado Beach Hotel

Corporation (DBHC). The district court entered judgment in the

D/P Litigation, see Dopp I, 755 F. Supp. at 504, and a firestorm

of appeals ensued. We eventually upheld the liability finding

but vacated the damage award and ordered a new trial limited to

questions of remediation. See Dopp II, 947 F.2d at 520.

As these events were unfolding, Dopp launched a

collateral enterprise, assigning various portions of the

anticipated proceeds of the D/P Litigation to third parties. He


1For purposes of oral argument, we consolidated the
financiers' appeals with three other appeals two taken by
Pritzker and one by Dopp involving the remedial phase of the
main litigation. We resolved most of the points raised in
Pritzker's and Dopp's appeals by means of a separate opinion
issued on October 28, 1994. See Dopp IV, supra. In this
opinion, we deal with not only the financiers' appeals but also
the complaints voiced by Pritzker and Dopp concerning the
district court's rulings anent the financing agreements.

4

undertook this effort, in his words, "to meet some of the

litigation and personal expenses . . . incurred during the years

of this intense litigation and in connection therewith." All

told, Dopp entered into three separate nonuniform financing

agreements with three distinct financiers.

Dopp signed the first financing agreement, styled as a

"Judgment or Settlement Purchase Agreement," on June 26, 1990.

In this transaction, Lincoln agreed to provide $50,000 in

exchange for an 8% interest in the proceeds of the D/P Litigation

above a stipulated floor. The agreement obliged Dopp to apprise

Lincoln of developments in the litigation on a current basis.

Dopp entered into the second financing agreement on

October 16, 1991. In it, BPC agreed to provide $100,000 in

exchange for a 5% interest in the proceeds of the D/P Litigation

over a floor different from that negotiated between Dopp and

Lincoln. Moreover, the BPC agreement mandated certain minimum

repayments to the financier. These minima varied depending upon

the date on which, in the words of the contracting parties, the

D/P Litigation might eventually be "settled or otherwise

decided." Like the Lincoln agreement, the BPC agreement obliged

Dopp to keep the financier seasonably informed of litigatory

developments.

Dopp entered into the third and last financing

agreement on July 23, 1992. In consideration of $250,000 in cash

and a promise to obtain, or at least to assist in obtaining, a

$2,500,000 to $3,000,000 line of credit for one year, Dopp agreed

5

to allocate the remainder of the proceeds of the D/P Litigation

according to a preset formula: "(i) first, to repayment of all

indebtedness in relation to the line of credit to have been

obtained in Dopp's name; (ii) second, $2,500,000 to Yari; (iii)

third, $12,000,000 to Dopp; (iv) fourth, $7,000,000 to Yari; and

(v) fifth, the remaining amount, if any, to be divided equally

between Dopp and Yari." Dopp III, 831 F. Supp. at 954.2 The

Yari agreement also set in place virtual joint control of the

litigation. Although Yari ultimately provided less funding

(somewhere between $500,000 and $625,000) than Dopp claims was

due, the district court found that Yari "complied with all of his

obligations under his agreements . . . ." Id. at 956.

B. Pertinent Proceedings Below. B. Pertinent Proceedings Below.

On October 9, 1992, Dopp disclosed the existence of the

financing agreements in the midst of a new discovery round.

Exactly one week later, Pritzker wrote to Lincoln, offering to

tender the amount paid to Dopp in exchange for Lincoln's rights

and beneficial interests under its financing agreement. On the

same date, Pritzker sent substantially identical missives to BPC

andYari,3and notifiedthe districtcourtof hisletter-writing spree.


2On September 24, 1992, Dopp and Yari entered into a written
modification of their agreement. The amendment is only
peripherally related to the issues we must decide today. To the
extent it is relevant, we discuss it in Part III(D), infra.

3Pritzker made the three tenders pursuant to article 1425 of
the Civil Code of Puerto Rico, which provides in its entirety:

When a litigated credit is sold, the
debtor shall have the right to extinguish the
same by reimbursing the assignee for the

6

When his communiques drew no meaningful response,

Pritzker promptly filed a complaint in the district court. He

named Dopp and the three financiers as defendants, along with an

ostensible partnership between Dopp and Yari. Pritzker averred

that each of the financing agreements involved the sale of a

litigated credit within the meaning of article 1425 and, hence,

was subject to extinguishment. Between December 18, 1992, and

June 1, 1993, Pritzker, through a series of motions, deposited

with the district court the funds that he believed were necessary

to redeem the financiers' interests in the proceeds of the D/P

Litigation.

BPC moved to dismiss Pritzker's complaint against it

for want of in personam jurisdiction, but the district court

demurred.4 After all defendants had answered the complaint, the


price the later [sic] paid for it, the
judicial costs incurred by him, and the
interest on the price from the day on which
the same was paid.

A credit shall be considered as
litigated from the day the suit relating to
the same has been answered.

The debtor may make use of his right
within nine (9) days, counted from the day
the assignee should demand payment of him.

P.R. Laws Ann. tit. 31, 3950 (1991).

4BPC's motion stressed that it is a New York corporation
transacting no routine business in Puerto Rico; that it has never
had an office or agent in Puerto Rico; that Dopp and BPC signed
the financing agreement in New York; that Dopp is a citizen and
resident of New Jersey; and that Pritzker is a citizen and
resident of Illinois. The district court found these facts, by
and large, to be accurately stated. See Pritzker v. Yari, Civ.
No. 92-2825, 1993 WL 71760, at *3, slip op. at 6 (D.P.R. Mar. 5,

7

court consolidated Pritzker's suit with Dopp's suit against

Pritzker. See id. at 942-43. In an opinion dated March 5, 1993,

the court held that all three financing agreements involved

litigated credits within the reach of article 1425, and that

Pritzker was entitled, pursuant to that statute, to extinguish

such credits through full reimbursement of the amounts advanced

(together with interest and costs). See Pritzker v. Yari, Civ.

No. 92-2825, 1993 WL 71760, at *5-7, slip op. at 11-17 (D.P.R.

Mar. 5, 1993). In a later, end-of-case opinion, the court

reaffirmed this holding, see Dopp III, 831 F. Supp. at 952,

carved out a partial exception applicable to Yari, see id. at

957-58, and determined the monetary amounts each party stood to

lose or gain, see id. at 958-59.

Following the entry of final judgment, the three

financiers filed notices of appeal. Lincoln and Yari contested

the application of article 1425 to their agreements. BPC

piggybacked on this argument, but focused its appeal mainly on

jurisdictional questions. Dopp joined the chorus, but, as he

contributed no arguments that were both novel and substantial, we

subsume his views in our ensuing discussion of the financiers'

points on appeal. Pritzker cross-appealed, excoriating the

district court's determination that he could redeem only one-half

of Yari's litigated credit.


1993). The court added, however, "that the agreement [BPC]
entered into with Dopp involved the purchasing of an interest in
a case being tried in the District of Puerto Rico and that BPC
has manifested a continuing interest in the conduct of the
litigation." Id.

8

II. PERSONAL JURISDICTION II. PERSONAL JURISDICTION

Before proceeding to the main event, we must first jump

through a jurisdictional hoop and determine whether the district

court properly exercised in personam jurisdiction over BPC. The

hoop does not present an impenetrable obstacle.

A. Charting a Course. A. Charting a Course.

In its simplest formulation, in personam jurisdiction

relates to the power of a court over a defendant. It is of two

varieties, general and specific. General personal jurisdiction,

as its name implies, is broad in its ambit: it is the power of a

forum-based court, whether state or federal, over a defendant

"which may be asserted in connection with suits not directly

founded on [that defendant's] forum-based conduct . . . ."

Donatelli v. National Hockey League, 893 F.2d 459, 462-63 (1st

Cir. 1990). Put another way, "[g]eneral jurisdiction exists when

the litigation is not directly founded on the defendant's forum-

based contacts, but the defendant has nevertheless engaged in

continuous and systematic activity, unrelated to the suit, in the

forum state." United Elec. Workers v. 163 Pleasant St. Corp.,

960 F.2d 1080, 1088 (1st Cir. 1992) (Pleasant St. I). Specific

personal jurisdiction, by contrast, is narrower in scope and may

only be relied upon "where the cause of action arises directly

out of, or relates to, the defendant's forum-based contacts."

Id. at 1088-89.

Nothing in the record before us suggests that BPC

engaged within Puerto Rico in continuous and systematic activity.

9

Since it is the plaintiff's burden to establish facts sufficient

to sustain general in personam jurisdiction, see Ticketmaster-New

York, Inc. v. Alioto, 26 F.3d 201, 207 n.9 (1st Cir. 1994);

Dalmau Rodriguez v. Hughes Aircraft Co., 781 F.2d 9, 10 (1st Cir.

1986), and since Pritzker failed to carry that burden here, we

may assume that general jurisdiction is lacking. Our analysis,

therefore, focuses exclusively on specific jurisdiction.

The proper exercise of specific in personam

jurisdiction hinges on satisfaction of two requirements: first,

that the forum in which the federal district court sits has a

long-arm statute that purports to grant jurisdiction over the

defendant; and second, that the exercise of jurisdiction pursuant

to that statute comports with the strictures of the Constitution.

See Ticketmaster, 26 F.3d at 204; Pleasant St. I, 960 F.2d at

1086; Hahn v. Vermont Law Sch., 698 F.2d 48, 51 (1st Cir. 1983).

We analyze these requirements separately, mindful that, in the

circumstances of this case, the second prong of the inquiry

necessitates an examination into the sufficiency of the

relationship between BPC's contract to finance Dopp's Puerto

Rico-based litigation and the exercise of jurisdiction over BPC

by the Puerto Rico-based federal district court.

B. The Long-Arm Statute. B. The Long-Arm Statute.

The requirement that the forum have a long-arm law of

appropriate reach is easily satisfied here. A Puerto Rico

statute provides in pertinent part that a Puerto Rico-based court

may take jurisdiction over a person not domiciled in Puerto Rico

10

"if the action or claim arises because said person . . .

transacted business in Puerto Rico personally or through an agent

. . . ." P.R. Laws Ann. tit. 32, app. III, R.4.7(a)(1) (1984 &

Supp. 1989). We have concluded before, and today reaffirm, that

this statute extends personal jurisdiction as far as the Federal

Constitution permits. See Dalmau Rodriguez, 781 F.2d at 12

(citing A.H. Thomas Co. v. Superior Court, 98 P.R.R. 864, 870 n.5

(1970)); Mangual v. General Battery Corp., 710 F.2d 15, 19 (1st

Cir. 1983).

C. Due Process. C. Due Process.

The second requirement that the exercise of

jurisdiction fall within constitutional bounds presents a more

intricate puzzle. Whether or not BPC "transacted business"

within the meaning of the long-arm statute depends on whether the

requisite minimum contacts can be attributed to it. By its very

nature, the inquiry into minimum contacts is far from exact: "the

criteria by which we mark the boundary line between those

activities which justify the subjection of a corporation to suit,

and those which do not, cannot be simply mechanical or

quantitative." International Shoe Co. v. State of Washington,

326 U.S. 310, 319 (1945). The inquiry into minimum contacts is

also highly idiosyncratic, involving an individualized assessment

and factual analysis of the precise mix of contacts that

characterize each case. See Pleasant St. I, 960 F.2d at 1088;

Hahn, 698 F.2d at 51.

To sharpen the logic of the personal jurisdiction

11

inquiry, we have developed a tripartite analysis:

First, the claim underlying the litigation
must directly arise out of, or relate to, the
defendant's forum-state activities. Second,
the defendant's in-state contacts must
represent a purposeful availment of the
privilege of conducting activities in the
forum state, thereby invoking the benefits
and protections of that state's laws and
making the defendant's involuntary presence
before the state's court foreseeable. Third,
the exercise of jurisdiction must, in light
of the Gestalt factors, be reasonable.

Pleasant St. I, 960 F.2d at 1089; see also Ticketmaster, 26 F.3d

at 206; Pizarro v. Hoteles Concorde Int'l, C.A., 907 F.2d 1256,

1258 (1st Cir. 1990). A careful application of these three

elements to the facts at hand demonstrates that the exercise of

in personam jurisdiction over BPC, for the specific purpose of

determining the legal status of its agreement with Dopp, does not

offend constitutional principles.

1. Relatedness. The element of relatedness is not 1. Relatedness.

difficult to satisfy here. For one thing, the relatedness test

is, relatively speaking, a flexible, relaxed standard. See

Ticketmaster, 26 F.3d at 207. For another thing, it is self-

evident that the dispute between Pritzker and BPC over the legal

status of BPC's contract with Dopp would not have arisen but for

that contract. Because the very document that represents BPC's

forum-related activity is itself the cause and object of the

lawsuit, this activity comprises the source and substance of, and

is thus related to, Pritzker's squabble with BPC. See Pleasant

St. I, 960 F.2d at 1089.

2. Purposeful Availment. We must next determine 2. Purposeful Availment.

12

whether BPC's Puerto Rico-based contacts "represent a purposeful

availment of the privilege of conducting activities in [Puerto

Rico], thereby invoking the benefits and protections of [its]

laws and making the defendant's involuntary presence before [the

Puerto Rico-based] court foreseeable." Id.

The path of inquiry is neither long nor winding. It

necessarily begins with McGee v. International Life Ins. Co., 355

U.S. 220 (1957). There, the Court ruled that a California court

could properly exercise jurisdiction over an out-of-state insurer

in a suit brought by a beneficiary of a policy written by the

insurer at the behest of a California resident, even though the

insurer had no office or agent in California and had never

performed any other business in that state. The McGee Court

articulated a principle of marked importance for our purposes:

in order to be subject to the jurisdiction of the forum state, a

nonresident need have only one contact with the forum, so long as

the contact is meaningful. See id. at 223 ("It is sufficient

for purposes of due process that the suit was based on a contract

which had substantial connection with that State.").

Accordingly, McGee stands for the proposition that "minimum

contacts" is not necessarily a numbers game; a single contract

can fill the bill.

For our purposes, McGee remains good law.5 In Burger


5The court below expressed some hesitation about relying on
McGee, fearing that "the broad view of personal jurisdiction
articulated in McGee was curtailed in the next major Supreme
Court case dealing with the issue, Hanson v. Denckla, 357 U.S.
235 (1958)." Pritzker v. Yari, supra, at *4, slip op. at 9.

13

King Corp. v. Rudzewicz, 471 U.S. 462 (1984), the Court, citing

McGee, affirmed the principle that "even a single act can support

jurisdiction." Id. at 475 n.18. In that case, the Justices held

that a court sitting in Florida properly could exercise

jurisdiction over a Michigan resident in a suit brought by a

Florida corporation for breach of a franchise agreement, even

though the defendant's only relationship to the forum state was

of a contractual nature. Explaining that "[j]urisdiction in

these circumstances may not be avoided merely because the

defendant did not physically enter the forum State," id. at 476,

the Supreme Court observed that "where individuals `purposefully

derive benefit' from their interstate activities, it may well be

unfair to allow them to escape having to account in other States

for consequences that arise proximately from such activities; the

Due Process Clause may not readily be wielded as a territorial

shield to avoid interstate obligations that have been voluntarily

assumed." Id. at 474-75 (quoting Kulko v. California Superior

Court, 436 U.S. 84, 96 (1978)).

These opinions demonstrate that the jurisprudence of


This observation is true but beside any relevant point. The
Hanson Court placed its principal emphasis on the requirement
that there be a purposeful act by the defendant, and that this
requirement may not be satisfied merely by the unilateral act of
another. See Hanson, 357 U.S. at 253-54. The Court
distinguished McGee on this basis, and on the ground that Hanson,
unlike McGee, "involve[d] the validity of an agreement that was
entered without any connection with the forum State." Id. at
252. In the instant case, neither of these problems looms.
BPC's decision to enter into the financing agreement was clearly
its own, and that agreement, which entitled it to share the
proceeds of Puerto Rico-based litigation, bears close ties to the
forum.

14

minimum contacts casts a wide net, and a nonresident defendant

may not always be able to elude the net by such simple expedients

as remaining physically outside the forum or limiting contact

with the forum to a single commercial transaction. Rather,

courts must look beyond these formalistic measures and evaluate

the nature of the contacts and, relatedly, the degree to which

they represent a purposeful availment of the forum's protections

and benefits.

In the instant case, we conclude that BPC, by knowingly

acquiring an economically beneficial interest in the outcome of a

Puerto Rico-based lawsuit that involved control over property

located in Puerto Rico, necessarily exhibited sufficient minimum

contacts to subject it to the district court's exercise of

specific in personam jurisdiction. Two considerations in

particular lead us to this conclusion.

First, the subject matter of BPC's contact or

relationship with Puerto Rico the consummation of the financing

agreement is such that it can only be characterized as an act

of purposeful availment. We think it is doubly significant that

the financing agreement directly concerned forum-based

litigation, and, in turn, that the litigation directly concerned

forum-based real estate. Other than physical presence, we can

imagine few contacts that are more integral to a forum than

acquiring a financial stake in forum-based litigation concerning

15

forum-based property.6 The significance that Puerto Rico

attaches to such an interest is reflected elsewhere in its long-

arm statute, in which land ownership is deemed an independently

sufficient basis for exercising personal jurisdiction. See P.R.

Laws Ann. tit. 32, app. III, R.4.7(a)(5) (extending jurisdiction

of Puerto Rico courts over a person who "[o]wns, uses or

possesses, personally or through his agent, real property in

Puerto Rico").

Second, the specific nature of a contact is also

important in discerning the elements of purposeful availment and

foreseeability. BPC entered into its financing agreement

precisely because it stood to benefit commercially from the

eventual outcome of the Puerto Rico-based D/P Litigation.

Furthermore, given the location of DBHC's assets and the nature

of the remedies potentially available to Dopp, see Dopp II, 947

F.2d at 519 (listing alternative remedies), both the extent of

BPC's profits and the value of its agreement were closely tied to

the integrity and stability of Puerto Rico's economy. This means

that the practical importance of BPC's relationship with Puerto

Rico was far greater than the importance that could be attached

to the random, fortuitous, or attenuated relationships about

which the Court has previously voiced concern. See, e.g., Burger

King, 471 U.S. at 475; Keeton v. Hustler Magazine, Inc., 465 U.S.


6Indeed, had Dopp succeeded in obtaining resolution (his
preferred remedy in the D/P Litigation, see Dopp IV, F.3d at
[slip op. at 7-17]), he might have wound up with the hotels
and the land, and, if so, BPC would presumably have been the
equitable owner of a measurable interest in those properties.

16

770, 774 (1984); World-Wide Volkswagen Corp. v. Woodson, 444 U.S.

286, 299 (1980). Consequently, we believe that BPC's venture

represented nothing less than a purposeful availment of the

privilege of conducting activities in Puerto Rico.7

BPC disagrees with this conclusion. It argues that the

singularity of its contact renders the financing agreement

quantitatively insufficient as a predicate for the exercise of

jurisdiction. This argument fails for two reasons.

In the first place, we do not view BPC's financing

agreement as merely a one-time rendezvous with the forum. BPC

cannot retract the fact that it backed Dopp's forum-based suit,

so that its pact can hardly be cracked up to be an act that

lacked incessant impact, but, rather, smacked of the exact sort

of contact through which jurisdiction, if attacked, might be

tracked and should remain intact. A contract conferring an

interest in ongoing litigation that touches upon the legal status


7Although we have been unable to find any judicial decision
squarely on point, we are reinforced in our conclusion by the
results reached in analogous cases. See, e.g., Grimes v.
Vitalink Communications Corp., 17 F.3d 1553, 1559-60 (3d Cir.)
(finding specific personal jurisdiction over a nonresident who
owned stock in a forum-based corporation and who tendered it in
accordance with a tender offer, on the ground that the defendant
purposefully availed himself of the privilege of having a forum-
based court determine his rights and thus invoked the benefits
and protections of the forum), cert. denied, 115 S. Ct. 
(1994); Manley v. Fong, 734 F.2d 1415, 1419-20 (10th Cir. 1984)
(finding personal jurisdiction over a nonresident in regard to
litigation arising out of a contract between the nonresident and
a resident, executed out-of-state, for the purchase of an
interest in a forum-state oil-and-gas lease); Quasha v. Shale
Dev. Corp., 667 F.2d 483, 486-89 (5th Cir. 1982) (finding
personal jurisdiction over nonresidents in a suit concerning the
existence, enforceability, and performance of a contract to
purchase mineral interests located in the forum state).

17

of real property situated in the forum establishes, by its very

nature, a significant relationship with the forum and its legal

system. Thus, it is easy to see how such a contact can become a

hook on which in personam jurisdiction can be hung. See Burger

King, 471 U.S. at 475 n.18 (noting that "[s]o long as it creates

a `substantial connection' with the forum, even a single act can

support jurisdiction," and distinguishing this from an "isolated"

act in respect to which "the reasonable foreseeability of

litigation in the forum is substantially diminished") (quoting

McGee, 355 U.S. at 223).

In the second place, BPC's emphasis on the quantitative

aspects of its contact ignores both the contact's qualitative

aspects and the role of substance, as opposed to mere frequency,

in the minimum contacts calculus. So one-sided a view distorts

reality. See International Shoe, 326 U.S. at 318 (assessing a

defendant's acts by "their nature and quality and the

circumstances of their commission").

BPC also contends that the exercise of jurisdiction

here would be inconsistent with circuit precedent. In this vein,

BPC directs our attention to Pizarro, a case in which we held

that a corporation's placement of nine advertisements in a Puerto

Rico newspaper did not create in personam jurisdiction for

purposes of a tort suit brought by a person who responded to an

advertisement, took a trip to the advertised resort, and

18

sustained personal injuries outside of Puerto Rico.8 See

Pizarro, 907 F.2d at 1260.

We do not think that Pizzaro is in any way antithetical

to the result we reach today. We decided Pizarro based on a lack

of relatedness, specifically finding that the advertisements had

"no connection with the negligent act . . . that allegedly caused

the injury," and that, therefore, it could not "be said that the

negligent act `arose out of' [the defendant's] placing of the

advertisements . . . ." Id. at 1259. Since relatedness is

beyond question in the present case, see supra Part II(C)(1),

Pizarro is not on point and BPC's reliance on it is mislaid.

3. The Gestalt Factors. Having determined that BPC's 3. The Gestalt Factors.

financing agreement falls within the ambit of sufficient minimum

contacts, we proceed to the third and final element of our

analysis and inquire whether the exercise of jurisdiction over

BPC in the circumstances of this case would, holistically viewed,

offend traditional notions of "fair play and substantial

justice." Burger King, 471 U.S. at 476 (quoting International

Shoe, 326 U.S. at 320).

Admittedly, "fair play" and "substantial justice" are

not the most self-defining of legal formulations. For that

reason, we have added the flesh of a five-factor gestalt analysis

to these skeletal due process concepts. The factors include:



8Pizarro typifies a line of cases to like effect. See,
e.g., Fournier v. Best W. Treasure Island Resort, 962 F.2d 126
(1st Cir. 1992); Marino v. Hyatt Corp., 793 F.2d 427 (1st Cir.
1986).

19

(1) the defendant's burden of appearing, (2)
the forum state's interest in adjudicating
the dispute, (3) the plaintiff's interest in
obtaining convenient and effective relief,
(4) the judicial system's interest in
obtaining the most effective resolution of
the controversy, and (5) the common interests
of all sovereigns in promoting substantive
social policies.

Pleasant St. I, 960 F.2d at 1088. These gestalt factors are

designed to put into sharper perspective the reasonableness and

fundamental fairness of exercising jurisdiction in particular

situations. See Ticketmaster, 26 F.3d at 210. They "are not

ends in themselves, but they are, collectively, a means of

assisting courts in achieving substantial justice. In very close

cases, they may tip the constitutional balance." Id. at 209.

When applied to the case sub judice, the gestalt factors point

unerringly toward the exercise, and away from the declination, of

jurisdiction over BPC.

As to the first factor, we may fairly assume that the

defendant's appearance in Puerto Rico is to some extent

burdensome. But the concept of burden is inherently relative,

and, insofar as staging a defense in a foreign jurisdiction is

almost always inconvenient and/or costly, we think this factor is

only meaningful where a party can demonstrate some kind of

special or unusual burden. See, e.g., id. at 210 (noting that

"most of the cases that have been dismissed on grounds of

unreasonableness [of the burden of appearing] are cases in which

the defendant's center of gravity, be it place of residence or

place of business, was located at an appreciable distance from

20

the forum"); see also Burger King, 471 U.S. at 474 (explaining

that "it usually will not be unfair to subject [a nonresident

defendant] to the burdens of litigating in another forum for

disputes relating to [in-forum economic] activity"). In the

modern era, the need to travel between New York and Puerto Rico

creates no especially ponderous burden for business travelers.

Thus, BPC has not adequately demonstrated that an exercise of

jurisdiction in the present circumstances is onerous in a

special, unusual, or other constitutionally significant way.

The second factor the interest of Puerto Rico in

having a Puerto Rico-based court adjudicate the dispute weighs

heavily in favor of an exercise of jurisdiction. Sovereigns have

few interests greater than those in the conduct of forum-based

litigation and the disposition of forum-based real estate. Here,

these interests are not only present; they constitute the essence

of the suit which the nonresident defendant, BPC, seeks to

avoid.9

The third factor is the plaintiff's interest in

obtaining convenient and effective relief. This consideration

likewise cuts in favor of jurisdiction. Not only must we "accord

plaintiff's choice of forum a degree of deference in respect to

the issue of its own convenience," Ticketmaster, 26 F.3d at 211,

but also we must take note of the enormous inconvenience that



9At the expense of carting coal to Newcastle, we think that
the Commonwealth also possesses an atypically strong interest in
having Puerto Rico-based courts hear and resolve controversies
involving its litigated credit statute.

21

might result from forcing Pritzker to sue elsewhere

theoretically, in every jurisdiction in which a financier is

located despite ongoing litigation in a forum-based court.

The fourth factor the judicial system's interest in

obtaining the most efficacious resolution of the controversy

similarly counsels against furcation of the dispute among several

different jurisdictions. Such a result would both contravene the

goal of judicial economy and conjure up the chimera of

inconsistent outcomes.

The fifth and last of the gestalt factors implicates

the interests of the affected governments in substantive social

policies. Here, the most salient such policy is that embodied in

article 1425 itself: the discouragement of speculation in

litigation. All sovereigns share both a general interest in

preventing such speculation and a specific interest in respecting

Puerto Rico's decision to control this activity through

regulation. For obvious reasons, a failure to find jurisdiction

in this case would necessarily subvert these interests.

D. Recapitulation. D. Recapitulation.

In sum, by deliberately contracting for a portion of

the proceeds of litigation, the subject of which concerned Puerto

Rico property and the situs of which was a Puerto Rico-based

court, BPC deliberately sought to procure the commercial

advantages of transacting business in Puerto Rico. Having called

the tune, it now must pay the piper. Hence, we conclude that the

instant litigation arises out of, and thus directly relates to,

22

the financing agreement that BPC consummated with Dopp. Because

that agreement has a distinctive relationship to Puerto Rico as

we have said, its subject matter and specific nature betoken that

BPC purposefully availed itself of the benefits and protections

of Puerto Rico and its legal apparatus and because BPC's

subsequent (involuntary) presence before the district court was

entirely foreseeable, bringing BPC before the bar of a Puerto

Rico-based court in respect to litigation arising out of the

financing agreement is neither unreasonable nor fundamentally

unfair. It follows, therefore, as night follows day, that Puerto

Rico's long-arm statute reaches this dispute, and the lower

court's exercise of in personam jurisdiction over BPC is both

legally and constitutionally supportable.

III. THE FINANCING AGREEMENTS III. THE FINANCING AGREEMENTS

We turn now to the main event a series of questions

involving the enforceability and interpretation of the financing

agreements. In answering these questions, we look to the law of

Puerto Rico for the rule of decision.10 See Erie R.R. Co. v.


10BPC and Yari halfheartedly attempt to challenge the
district court's choice of Puerto Rico law to govern their
respective contracts with Dopp. Neither entry makes it to the
starting gate. Yari merely proposes how his contract with Dopp
might be construed under California law, without pausing to
explain why California law is relevant. Our corpus of cases,
cumulatively considered, clearly commands that contentions which
are not carefully composed and candidly constructed customarily
careen beyond the cognizance of this court. See, e.g., Ryan v.
Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) ("It is settled
in this circuit that issues adverted to on appeal in a
perfunctory manner, unaccompanied by some developed
argumentation, are deemed to have been abandoned."). BPC's claim
fails for several reasons, the first of which is that the record
contains no indication that BPC developed it below. "It is a

23

Tompkins, 304 U.S. 64, 78 (1938).

Article 1425 of the Civil Code confers on a defendant a

right to redeem a "litigated credit" or "litigious credit," that

is, the interest of a third party who has purchased a stake in

the outcome of civil litigation. Evaluating this statute is a

daunting task, made all the more complicated in this case as the

parties have raised a myriad of issues ranging from the legal

status of the financing agreements to the propriety of Pritzker's

efforts to prime the article 1425 pump. We address these issues

sequentially, for the most part subjecting the district court's

determinations to plenary review. See United States v. Gifford,

17 F.3d 462, 472 (1st Cir. 1994) (holding that questions of

statutory interpretation are purely legal in nature, and, thus,

engender de novo review); Liberty Mut. Ins. Co. v. Commercial

Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992) (same); see

also Salve Regina Coll. v. Russell, 499 U.S. 225, 239-40 (1991)

(holding that "courts of appeals [must] review the state-law

determinations of district courts de novo").

A. Article 1425. A. Article 1425.

We begin our expedition by clarifying certain matters

relating to article 1425 (the text of which is reproduced in its

entirety in note 3, supra). The undue hullabaloo in this case

stems from the fact that article 1425 is a very unusual animal.



bedrock rule that when a party has not presented an argument to
the district court, he may not unveil it in the court of
appeals." United States v. Slade, 980 F.2d 27, 30 (1st Cir.
1992).

24

Several aspects of the statute deserve emphasis or elaboration.

First, the purpose of article 1425, as recently

restated by the Puerto Rico Supreme Court, is to prevent "`the

illegal trade of litigious credits which were purchased for a

price below their actual value, and then the actual price was

recovered from the debtor and big profits reaped.'" Consejo de

Titulares v. Urban Renewal & Hous. Corp., 93 J.T.S. 25 (1993)

(Official English Translation: No. RE-87-297, slip op. at 14)

(quoting 3 D. Espin Canovas, Manual de Derecho Civil Espanol 240

(1983)); Mervin H. Riseman, The Sale of a Litigious Right, 13

Tul. L. Rev. 448, 448 (1939) ("A desire to put an end to

litigation and to prevent speculation in lawsuits has resulted in

the disapproval by the civil law of the sale of litigious

rights."). To this extent, then, the district court hit the

bull's-eye when it declared that the "single, serious purpose" of

article 1425 is "to discourage financial speculation in

litigation." Pritzker v. Yari, supra, at *5, slip op. at 11-12.

Second, the Puerto Rico Supreme Court has recognized,

in fidelity to the statutory text, that "[a] credit is deemed

litigious from the moment the lawsuit claiming the same is

answered." Consejo de Titulares, supra, slip op. at 13. The

court added:

[A] credit is regarded as litigious when,
upon being litigated, a final judgment is
required to ascertain its existence, "that
is, it is one which is in doubt and one in
which the rights are uncertain. For a credit
to be considered litigious it is essential
that the litigation pending at the time of
sale or assignment of credit concern the

25

existence of the credit itself and not merely
the consequences of its existence once final
judgment is rendered."

Id. at 13-14 (quoting Martinez v. District Court, 72 P.R.R. 197,

199 (1951)). Here, there is no doubt that the financing

agreements involve interests that fall within the contemplated

chronological span.

Third, article 1425 identifies the parties in interest

in terms that are somewhat different than those used in

conventional litigation. We consider the "debtor" to be the

original defendant (Pritzker), and the "assignee" to be the

third-party investor (Yari, Lincoln, or BPC, depending on the

financing agreement in question). To carry out this theme, the

original plaintiff (here, Dopp) would be the "assignor."

Having thus introduced the generalities and

particularities of article 1425, we proceed to consider its

application.

B. The Legal Status of the Financing Agreements. B. The Legal Status of the Financing Agreements.

The financiers contend that none of their agreements

with Dopp involved litigated credits subject to the strictures of

article 1425. We reject this contention and hold that the

financing agreements fall squarely within the purview of article

1425. Accordingly, the statute governs their legal disposition.

1. The Transfer-of-Title Theory. The financiers' 1. The Transfer-of-Title Theory.

principal argument is that article 1425 should not be applied to

the financing agreements because the statute contemplates that an

assignee will actually replace, not merely bankroll, the assignor

26

in the prosecution of the latter's claim against the debtor, and

that no such substitution transpired here. This amounts to a

claim that article 1425 is only effective when the assignee steps

into the shoes of the assignor, or, put another way, when there

has been the functional equivalent of a transfer of title to all

or part of the assignor's lawsuit.11

In advancing this argument, the financiers rely heavily

on the historical origins of article 1425 as found chiefly in the

law of Spain and France. Citing numerous treatises and tracts,

they strive to persuade us that the statute, when viewed in terms

of its apparent original purpose, simply does not encompass the

conduct at issue here. In particular, they suggest that laws

like article 1425 were designed to prevent professional

litigators from stepping into a plaintiff's shoes for the

specific purpose of harassing a defendant. Because that is not

what happened here, thefinanciers claim the statuteis inapposite.

This is all well and good, but the text of article 1425

belies the financiers' claim. The statute is drafted in terms of

general applicability and its language is bereft of the slightest

ambiguity. No mention is made of a transfer-of-title

requirement, and, moreover, the plain language of article 1425

seems naturally suited to the scenario presented in this case.

In brief, we have no reason to doubt the applicability


11Although we assume arguendo that all three agreements
created interests exclusively in the proceeds, and not the
conduct, of the D/P Litigation, we note that at least one of the
financing agreements Yari's could be construed as empowering
the assignee to exercise substantial control over Dopp's lawsuit.

27

of article 1425 to the financing agreements, and thus to

Pritzker's efforts to redeem the interests they created, unless

we are prepared to wander beyond the four corners of the statute

in search of some ancient legislative intent. We cannot justify

undertaking such extra-textual measures in this case, especially

given the interpretive command of the Puerto Rico legislature:

"When a law is clear and free from all ambiguity, the letter of

the same shall not be disregarded, under the pretext of

fulfilling the spirit thereof." P.R. Laws Ann. tit. 31, 14

(1967 & Supp. 1989). Therefore, we reject the financiers'

argument that article 1425 should be read to impose a transfer-

of-title requirement.12 Compare Riseman, supra, at 460

(construing Louisiana's litigated credit statute, which, like the

Spanish and Puerto Rico statutes, had its immediate origin in the

French Civil Code and its ultimate origin in the Roman Lex

Anastasiana or Lex Per diversas et Ab Anastasio, and explaining

that it "merely provides for the nullity of the purchase of


12Yari tries to justify a transfer-of-title construction by
asserting that the district court's application of article 1425
to his agreement with Dopp renders meaningless the statute's
third sentence, which authorizes the debtor to extinguish a
litigated credit "within nine (9) days, counted from the day the
assignee should demand payment of him." P.R. Laws Ann. tit. 31,
3950 (1991) (emphasis supplied). In Yari's view, this language
requires that there have been a transfer of title from the
assignor to the assignee, including a transfer of the right to
proceed against the debtor. We decline to read the statute in so
crabbed a manner. While this language unquestionably provides
debtors in transfer-of-title situations with a temporal guidepost
for effectuating a redemption (at least in certain situations,
see infra Part III(C)), it does not thereby restrict the
statute's overall scope. At best, the phrase to which Yari
clings is designed to address a particular subset of litigated
credits, not the mine-run.

28

litigious rights, and the litigious right itself is not

annihilated. Thus title to the litigious right remains in the

original owner, and he still has the right to proceed against his

debtor for the amount owed to him.").

In following this course, we are not suggesting that

historical analyses or foreign legal sources are intrinsically

irrelevant in parsing the laws of Puerto Rico. We recognize that

the Spanish Civil Code, in particular, may sometimes constitute

significant authority in the interpretation of the Puerto Rico

Civil Code. See Republic Sec. Corp. v. Puerto Rico Aqued. &

Sewer Auth., 674 F.2d 952, 958 (1st Cir. 1982); see also

Bonillerse v. Gonzalez, 17 P.R.R. 1084, 1090 (1911) (explaining

that Puerto Rico courts sometimes "can look to eminent Spanish

authors for the proper interpretation of such portions of our

Civil Code as are copied literally from the Civil Code of

Spain"). But recourse to these extrinsic sources is neither

necessary nor appropriate when, as now, the text of a particular

Code provision is unambiguous.13


13Our unwillingness to rely upon extra-textual sources in
this instance is reinforced by our reservations about the
historical-exegetical enterprise advocated by the financiers.
From a practical standpoint, we question the wisdom and utility
of invoking ancient doctrines, gleaned from the writings of long-
deceased expositors, as a means of interpreting statutes to
govern the present day and age. Nor is this concern original
with us. See, e.g., Diaz Irizarry v. Ennia, N.V., 678 F. Supp.
957, 962 n.5 (D.P.R. 1988) ("Romantic as working with the Civil
Code may be, the clock cannot be turned back. It must be kept in
mind that the application of Spanish law to problems arising from
basic socioeconomic structures . . . which operate under
standards stemming from federal or American law is consistent
with neither practical reality and efficiency nor the sources of
law actually being applied in Puerto Rico today."); see also

29

2. The "Legitimate Purpose" Theory. Yari proposes 2. The "Legitimate Purpose" Theory.

that article 1425 is inapplicable to these financing agreements

since the right of redemption does not attach when the assignment

is made for a legitimate purpose, and that obtaining financing to

carry on pending litigation, as Dopp purportedly set out to do,

is such a purpose.

This argument founders for the most abecedarian of

reasons: the statute itself contains no such exception, and the

statutory text is not sufficiently problematic to invite judicial

editing that might lead to the possible recognition of such an

exception. As a fundamental principle of statutory construction,

we will not depart from, or otherwise embellish, the language of

a statute absent either undeniable textual ambiguity, see United

States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st

Cir. 1987) (expounding the primacy of plain meaning), or some

other extraordinary consideration, such as the prospect of

yielding a patently absurd result, see Sullivan v. CIA, 992 F.2d

1249, 1252 (1st Cir. 1993) ("Courts will only look behind

statutory language in the rare case where a literal reading must

be shunned because it would produce an absurd outcome, or when

the legislature has blown an uncertain trumpet.") (citations

omitted); see also Colonos de Santa Juana v. Sugar Bd., 77 P.R.R.

371, 374 (1954) (stressing the need, "wherever possible, [to]



Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev.
457, 469 (1897) ("It is revolting to have no better reason for a
rule of law than that so it was laid down in the time of Henry
IV.").

30

avoid an interpretation of a statute which would lead to an

unreasonable result"), aff'd, 235 F.2d 347 (1st Cir.), cert.

denied, 352 U.S. 928 (1956).

When interpreting a Puerto Rico statute, we must be

faithful not only to conventional rules of construction, but also

to the legislature's specific directives. One such directive is

the edict that unambiguous statutes must be construed according

to their letter. See P.R. Laws Ann. tit. 31, 14; see also

Roman v. Superintendent of Police, 98 P.R.R. 667, 671 (1966)

(adverting to 14 and admonishing that, when a statute is clear

and explicit, courts have no authority to add limitations or

restrictions that do not appear on its face).

This command carries unusual import in this situation,

since the legislature has expressly carved out three distinct

exceptions to the textual scope of article 1425. See P.R. Laws

Ann. tit. 31, 3951 (1991) (excluding "assignments or sales

made: (1) To a coheir or co-owner of the right assigned[;] (2)

To a creditor in payment of his credit[; or] (3) To the possessor

of an estate, subject to the right in litigation which has been

assigned"). The financiers' proposed exception is not to be

found in this compendium. As the maxim teaches, "expressio unius

est exclusio alterius." So it is here. Consequently, Yari's

"legitimate purpose" argument must fail, as it asks us to engraft

an exception beyond those enumerated, and does so in the face of

31

unambiguous statutory text.14

3. The "Fixed Price" Theory. Next, Yari maintains 3. The "Fixed Price" Theory.

that article 1425 applies only to contracts involving a fixed

purchase price, and that his agreement with Dopp does not qualify

in view of its somewhat novel line-of-credit feature. Because

article 1425 itself has nothing to say about whether or when a

price is fixed, we think this argument collapses by virtue of the

same legal principle previously discussed: a fixed price

requirement does not appear on the face of the statute and can

have no bearing on the interpretation of it.

In a transparent attempt to elude the force of plain

meaning, Yari hawks an alternative construction of article 1425.

He asserts that because the statute speaks in the past tense, it

only relates to assignments that constitute, or have constituted,

fully closed transactions. We think that this is anfractuous

reasoning, yielding an undesirable, overly cramped construction

of the statute. What is more, to the extent that this

construction can be regarded as importing uncertainty into

article 1425, the proper interpretive course would not be to

retreat into formalism, as Yari suggests, but, rather, to distill

and advance the "reason and spirit" of the statute. See P.R.

Laws Ann. tit. 31, 19 (1967 & Supp. 1989) ("The most effectual

and universal manner of discovering the true meaning of a law,



14We do not intend to imply that the legitimacy of Dopp's
purpose in forging these financing agreements is altogether
evident from the record. Rather, our disposition of Yari's
argument renders further exploration of this point unnecessary.

32

when its expressions are dubious, is by considering the reason

and spirit thereof; or the cause or motives which induced its

enactment.") (emphasis

supplied).

Here, the policy behind the statute to discourage

litigious profiteering would be disserved by allowing an

assignee to avoid redemption merely by using something other than

a fixed price as the consideration for his purchase. Thus, even

if there is ambiguity within the text of article 1425 a

proposition to which we do not subscribe Yari's proposed

construction is so isthmian as to offend the reason and spirit of

the statute.

Because the text of article 1425 plainly covers the

financing agreements, the district court correctly ruled that the

statute governed their disposition.

C. The Timing of the Tender. C. The Timing of the Tender.

The next snare set by the financiers is contrived from

a number of alleged improprieties which, they claim, render

Pritzker's efforts to extinguish the credits invalid. Most of

these assertions rest on the financiers' particular construction

of article 1425, and, therefore, have no continuing legal

relevance in light of our understanding of that statute. See

supra Part III(A)-(B). Withal, the financiers raise a colorable

question as to the positioning and shape of the nine-day window,

established in the third sentence of article 1425. We address

this question.

33

The district court determined that the period in which

Pritzker's article 1425 rights became operative "commenced on the

date Pritzker knew officially that the assignments had been

made." Pritzker v. Yari, supra, at *7, slip op. at 17. Since

Pritzker acquired the requisite knowledge on October 9, 1992, and

notified the parties of his intentions exactly one week later,

"Pritzker therefore duly exercised his rights within the time

provided by the statute." Id.

The district court's finding that Pritzker first

learned of the litigated credits on October 9 is not open to

attack.15 This finding does not fully answer the question

raised, because the financiers maintain that, even so, the

statute obligated Pritzker not simply to offer to tender the

funds necessary for redemption within the nine-day period, but

also actually to tender those funds or, at the very least,

deposit them with the court. Judge Pieras rejected this

analysis, ruling that the law required Pritzker, during the nine-

day interval, merely to offer to tender the amounts necessary to

acquire the interests then held by the assignees. See id. We

think that the rejection of the financiers' temporal challenge is

supportable, but we anchor it in a somewhat different, less

confining rationale.

The parties and the district court saw the question as



15If anything, this finding may not give sufficient range to
Pritzker's rights; while Dopp disclosed the existence of the
financing agreements on October 9, Pritzker probably did not
receive actual notice until October 12 or thereabouts.

34

a matter of what actions had to be taken within the nine-day

period. The financiers claimed that a debtor must actually

tender the funds, or deposit them in the registry of the court,

whereas the court, adopting a thesis urged by Pritzker, concluded

that a debtor need only offer a tender or deposit of the funds.

Both of these positions assume that the nine-day period is

applicable to the litigated credits at issue here. We question

this threshold assumption. On reflection, a third construction

of this portion of article 1425 presents itself: the nine-day

period enumerated in the third sentence speaks only of situations

in which, to use the statute's words, "the assignee should demand

payment of [the debtor]." Under this third construction, the

sentence in question does not govern the general operation of

article 1425, but, rather, only governs its operation within one

particular situation.16

We think that this construction is completely plausible

in light of the unqualified declaration in article 1425's first

sentence to the effect that "[w]hen a litigated credit is sold,

the debtor shall have the right to extinguish the same . . . ."

Moreover, if this interpretation prevails, it has obvious

consequences for these appeals: although it is true that, where

the nine-day period applies, it applies strictly, see Consejo de

Titulares, 93 J.T.S. 25 (slip op. at 14) ("The legal term for the

assigned debtor to exercise this litigious redemption is nine (9)

days from the date the assignee claims payment. This term which


16This is not such a situation. See supra note 12.

35

is extinguished with the lapse of time is final, unextendable and

cannot be tolled."), such rigidity is immaterial if the third

sentence does not encompass the litigated credit in question.17

We are left, then, with three competing interpretations

of this portion of article 1425. Yet, the task of choosing among

them is less formidable than it may first appear; for purposes of

this case, it suffices merely to narrow the field. Once that is

done, it becomes plain that, whether or not the third sentence

applies in this instance, the assigned error lacks force.

If and to the extent that the third sentence of article

1425 has pertinence here, we agree with the lower court that it

requires only an offer of redemption, not a full tender of funds,

within the nine-day period. Any other interpretation would

significantly undermine the efficacy of the statute, since it

would force debtors to marshall the funds immediately on receipt



17Of course, even if this third construction is accepted, it
does not answer the attendant question of whether the debtor's
redemption efforts, once he has notice of a litigated credit, can
ever be tardy. Both the spirit of the statute and common sense
dictate that some temporal limit should obtain, and that a
debtor's rights may, if not seasonably exercised, become stale
and expire. See Pritzker v. Yari, supra, at *7, slip op. at 15-
16 (hypothesizing that the purpose behind the nine-day window "is
to prevent the unfair situation of a debtor litigating at length
with an assignee and then, when the assignee has prevailed,
exercising the right of redemption"); Riseman, supra, at 453
(discussing Louisiana's analogous statute and concluding that
"[i]f, on learning of the transfer, [the debtor] continues to
contest the suit, he may not, when he realizes that the judgment
is about to become final or that he is going to lose the suit,
avail himself of the provisions which the law has established in
his favor for the purpose of terminating litigation"). Be that
as it may, these appeals do not warrant a full-dress inquiry into
timeliness, for Pritzker's offers plainly satisfy any timeliness
rule that might apply.

36

of notice, or else forfeit their rights. Because assignees could

more often than not time disclosure of their acquired interests

to minimize redemption opportunities, the notice provision would

become a trick box. We do not believe that the Puerto Rico

legislature intended to place assignees in so advantageous a

position.

In our estimation, the district court's shaping of the

nine-day window produces a more realistic and balanced

interpretation. Faithful to the overarching statutory purpose,

this reading allows the debtor merely to offer to redeem the

litigated credits within the nine-day period, thus placing the

assignees on notice of probable redemption, but without backing

the debtor into a cash-flow corner. This is the interpretation

of the third sentence of article 1425 that we believe the Puerto

Rico legislature intended and that we believe the Puerto Rico

courts will adopt.

In an effort to salvage their competing construction

through extra-textual assistance, the financiers dredge up an

assortment of other provisions of the Puerto Rico Civil Code

containing time restrictions, which, they suggest, ought to

inform our interpretation of article 1425. Although such extra-

textualism is not improper here the statute is, after all,

opaque on this particular point the financiers' efforts are

unavailing. For one thing, we remain unconvinced that randomly

culled provisions, entirely unrelated to litigated credits, have

anything worthwhile to say about the construction of article

37

1425. Cf. P.R. Laws Ann. tit. 31, 18 (1967 & Supp. 1989)

("Laws which refer to the same matter, or whose object is the

same, shall be interpreted with reference to each other, in order

that what is clear in one may be employed for the purpose of

explaining what is doubtful in another."). For another thing, to

the extent that other, unrelated provisions are relevant, they

seem to militate against, not in favor of, the financiers'

interpretive stance. In this regard, the district court

specifically noted that the legislature's use of more restrictive

phrasing in article 1414, P.R. Laws Ann. tit. 31, 3924 (1991)

(stipulating that "[t]he right of legal redemption cannot be

exercised except within nine (9) days"), indicates that article

1425's nine-day window should be construed in a relatively

liberal manner. "Had the legislature desired to place a similar

restriction on the commencement of the right to redeem litigious

credits, it would have used the limiting language of Article

1414, rather than the more flexible wording of Article 1425."

Pritzker v. Yari, supra, at *7, slip op. at 16. In the end, all

roads lead to Rome: the financiers' interpretation stalls no

matter which interpretive path one decides to follow.

Having rejected the first of the three alternative

constructions in favor of the second, we need not continue to

pursue the selection process. If, on the one hand, the nine-day

window applies that is, if the second construction prevails

nothing beyond an offer to redeem is exigible at that point, and

Pritzker's offer, made on day seven, undeniably meets the

38

statutory standard. If, on the other hand, the nine-day window

does not serve as a generic limitation on a debtor's ability to

proceed under the statute that is, if the third construction

prevails it follows a fortiori that Pritzker's failure to

tender the necessary funds within nine days of receiving official

notice is irrelevant, especially given his subsequent deposit of

funds with the court.

For the foregoing reasons, we hold that Pritzker's

efforts to redeem the financiers' interests fall within the

temporal compass of article 1425.

D. The Redemption of the Litigated Credits. D. The Redemption of the Litigated Credits.

Hesiod, reputed to be a shepherd and part-time poet,

wrote in Works and Days, roughly 2700 years ago, that "right

timing is in all things the most important factor." But timing

is not the only salient factor under article 1425: the statute

mandates that the debtor "reimburs[e] the assignee for the price

the [assignee] paid for [the litigated credit], the judicial

costs incurred by him, and the interest on the price from the day

on which the same was paid." Thus, article 1425 requires not

only the correct chronology, but also the proper price.

In most situations, ascertaining the proper price poses

no particular problem. For instance, BPC's and Lincoln's

litigated credits each involved a discrete sum that had already

been transferred to Dopp at the time Pritzker first exercised his

statutory rights. The add-ons "judicial costs" and "interest"

are subject to easy, mathematically precise computation.

39

Neither BPC nor Lincoln disputes that, ultimately, Pritzker

consigned the statutorily required amounts to the district court

in respect to their assignments. Consequently, the sufficiency

of Pritzker's payment to acquire the interests of these two

financiers is not before us.

Yari's agreement is a horse of a slightly different

hue.18 It never involved a simple one-time transfer of funds.

Instead, it originally involved two things a sum of money, and

assistance in establishing a line of credit in exchange for a

portion of the litigation proceeds. Later on, when Yari and Dopp

amended their agreement, see supra note 2, the modification

confirmed "that the parties `fully intend to move forward with

the present [July 23] Agreement despite the fact that a line of

credit may not be obtainable.'" Dopp III, 831 F. Supp. at 954

(quoting amendment). It also suggested that, perhaps, Yari might

become more personally involved in funding the D/P Litigation.

See id. (describing the modification as "call[ing] for Yari to

advance to Dopp, in an amount to be determined and to be

negotiated by the parties in good faith, funds necessary to allow

Dopp's prosecution of the [D/P Litigation] to proceed

diligently"). Yari thereafter complied with all specific funding

requests made by Dopp.19 All in all, Yari invested a total of


18Even so, Yari does not raise any cognizable questions
concerning the computation of "judicial costs" and "interest."

19Dopp waived the contention, belatedly raised in his reply
brief, that the question of Yari's compliance vel non should have
been submitted to the jury. See Sandstrom v. Chemlawn Corp., 904
F.2d 83, 86 (1st Cir. 1990). More generally, we have no reason

40

$500,000, according to the district court, see Dopp III, 831 F.

Supp. at 954, consisting of the following advances: $250,000

under the original financing agreement; $50,000 contemporaneous

with the execution of the modification to the financing

agreement; $100,000 on November 5, 1992; $50,000 in early

December of the same year; and, finally, $50,000 in March of

1993.

We need not delve too deeply into details at this time;

no matter what the fine print, it is perfectly clear that Yari's

obligations under his agreement with Dopp involved both cash and

non-cash components. Consequently, gauging the utility of

Pritzker's redemption efforts prompts us to examine the meaning

and scope of article 1425's reference to "the price . . . paid"

for a litigated credit.

In certain respects, this is a choice between the devil

and the deep blue sea. If the statute is interpreted to include

only the cash component of a hybrid offer, then it may run afoul

of the economic reality of the agreement. If, however, the

statute extends to the non-cash component, then the twin risks of

quantitative uncertainty and undesirable consequences loom, if

for no other reason than that such a rule might induce

contracting parties to structure financing agreements partly in

kind so as to make redemption more arduous.


to disturb the district court's finding that, despite having
failed to establish a line of credit, "Yari complied with his
obligations under the agreements and would be entitled to those
proceeds promised him under the terms of the Agreement and
qualified thereafter." Dopp III, 831 F. Supp. at 956.

41

The district court opted for the former interpretation,

specifically holding that "Pritzker does not assume Yari's

obligations and is required to do no more to redeem the credit

than to reimburse the price actually paid, plus interest and

expenses." Dopp III, 831 F. Supp. at 956. To bulwark its

position, the court noted that "[t]he courts of Louisiana, in

applying the provision of the Louisiana Civil Code which is

analogous to Article 1425, have reached the same result." Id. at

956 n.23 (citing Louisiana cases).

Though we do not go the whole hog, we agree up to a

point. We hold, as did the district court, that compliance with

article 1425 did not entail Pritzker's assumption of Yari's

responsibility to fund Dopp's suit against him. In respect to

damages arising out of a breach of contract, it is a basic tenet

of contract law that a legal remedy (e.g., a sum of money) is

presumptively preferable to an equitable remedy (e.g., specific

performance), so long as the former is adequate and

ascertainable. See 3 Farnsworth on Contracts, supra, 12.4.

Moreover, we echo the district court's sage observation that

granting specific performance would be "flatly inconsistent with

the purposes of Article 1425." Dopp III, 831 F. Supp. at 955

n.21. Endorsing such a remedy would force a debtor either to

forgo redemption indefinitely (thus running the risk of losing

his rights under article 1425) or to fund the assignor's case

against him.

Thus, when an article 1425 assignee, in exchange for a

42

stake in the outcome of litigation, transfers to the assignor

both cash and non-cash consideration, the debtor must tender to

the assignee the cash equivalent.20 Cf. Riseman, supra, at 452

(suggesting that if the price actually paid is lower than the

price stipulated in the financing agreement, "the `redeemer' need

pay only the `real' price").

It remains for us now to apply these principles to the

case at hand. On this record, there is no evidence that Yari's

promise to use best efforts to seek a line of credit sufficient

to fund Dopp's efforts in the D/P Litigation has any demonstrable

monetary value. See supra note 20. Given this void, we agree

with the court below that Pritzker should be permitted to redeem

Yari's litigated credit despite having tendered only an amount

corresponding to the funds actually transferred from Yari to Dopp

prior to the time Pritzker sued to enforce his asserted right of

redemption.21

E. The Equitable Reduction of Yari's Litigated Credit. E. The Equitable Reduction of Yari's Litigated Credit.

The district court, having determined that all three


20At the very least, the cash equivalent must correspond to
the cash component of a hybrid offer. We take no view of whether
there may be circumstances in which a debtor would have to
augment the cash component by adding to it the cash equivalent of
a non-cash component that has a demonstrable cash value. In this
case, Yari introduced no evidence to show the value of the non-
cash component; and, moreover, he never contended that Pritzker's
tender must be augmented in this manner. Any possible argument
in this regard is, therefore, waived. See, e.g., United States
v. Slade, 980 F.2d 27, 30 & n.3 (1st Cir. 1992).

21Neither Pritzker nor Yari contests the trial court's use
of the date Pritzker filed suit as the cutoff date for purposes
of redemption. We, therefore, accept Judge Pieras' selection of
that date uncritically, expressing no opinion on its propriety.

43

financing agreements came within the ambit of article 1425, ruled

that the arrangement between Dopp and Yari required special

treatment because their pact, as structured, concerned a "rare

situation[]" involving "peculiar facts." Dopp III, 831 F. Supp.

at 958-59. The court identified two particular concerns. First,

it expressed a sensitivity "to Dopp's need to obtain funds to

maintain his action against Pritzker," id. at 957, bearing in

mind that "Pritzker is a billionaire who could never be forced to

relent in his defense," id. at 957 n.25. Second, the court

reflected that, "although Yari technically complied with the

terms of his agreement with Dopp, he did not succeed in providing

what he originally intended. As a result, Dopp never received

what he hoped he had bargained for under the agreement." Id. at

957.

Based on these two concerns, and mindful that Pritzker

stood to receive a windfall on redemption of Yari's litigated

credit, the court concluded as a matter of statutory construction

that it "could not have been the intention" of the legislature to

allow full redemption in such a situation.22 Id. at 958. The

court wrote:

The Dopp/Yari agreement is far outside the
heartland of agreements contemplated by the
legislature when it enacted Article 1425. It
is likely that the lawmakers did not envision
the possibility of a case like this.


22At certain points in his appellate briefs, Dopp intimates
that the district court in effect reformed the Dopp/Yari
financing agreement. We do not read the court's opinion in that
way; and, moreover, the record on appeal evinces no basis for an
order tantamount to an order of reformation.

44

Property and assets have traditionally been
mortgageable to protect and preserve their
value. In this case, the lawsuit's worth is
an asset which requires expenditures for the
services of attorneys and experts, as well as
for other general costs of litigation to
preserve its value. To apply Article 1425
without allowing for adjustments to reflect
expenditures that have permitted the lawsuit
to survive would be to deplete and maybe
extinguish altogether the value of the
lawsuit . . . .

Id. To ameliorate this perceived inequity, the court limited

Pritzker's redemptive right to one-half the credit held by Yari.

See id.

Pritzker contends that the lower court's ruling

collides with the plain language and undeniable purpose of

article 1425. This contention raises a question of statutory

interpretation that sparks de novo review. See Gifford, 17 F.3d

at 472; Liberty Mut., 978 F.2d at 757.23

Exercising plenary review, we agree with Pritzker that,

as a matter of law, the district court's ruling cannot stand. As

with Yari's efforts to read certain unenumerated exceptions into

the statute, see supra Part III(B), the district court's

limitation on Pritzker's redemptive rights finds no purchase in


23Of course, a district court's equity power is relatively
broad and is typically subject to deferential review when the
exercise of that power is genuinely a function of the court's
discretion. See 1 Steven A. Childress & Martha S. Davis, Federal
Standards of Review 4.16, at 4-125 to 4-126 (2d ed. 1986 &
Supp. 1993). Nevertheless, such deference does not extend to
whatever errors of law may underlie a district court's remedial
or equitable determinations. See id. at 4-127 & n.4; see also
Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.
1991) (exempting mistakes of law from usual deferential review
accompanying district court's grant or denial of injunctive
relief).

45

the text of article 1425. The very existence of the litigated

credit statute evinces the legislature's likely knowledge that

windfalls can result when litigants barter future interests in

litigation proceeds. It is thus telling that the statute's

language neither suggests nor permits variable application

depending upon the extent of a particular windfall, the size of a

particular recovery, or the relative financial condition of

particular litigants. This can only signify that, as between

debtors and assignees, the legislature determined that the

former, rather than the latter, more properly deserved the

benefit of any trouvaille.

To be sure, it is always possible that legislators, in

drafting a statute, may not have considered the entire gamut of

possibilities that might come within the statute's sweep.

Nevertheless, "[w]hen a law is clear and free from all ambiguity,

the letter of the same shall not be disregarded, under the

pretext of fulfilling the spirit thereof." P.R. Laws Ann. tit.

31, 14 (1967 & Supp. 1989). In other words, courts, in Puerto

Rico as elsewhere, are simply not free to disregard the

unambiguous language of a law because the facts of a given case

to which the law applies evoke a sympathetic reaction. See,

e.g., Mansell v. Mansell, 490 U.S. 581, 594 (1989) (declining "to

misread [a] statute in order to reach a sympathetic result when

such a reading requires us to do violence to the plain language

of the statute"); cf. East India Co. v. Paul, 7 Moo. 85, 111

(P.C. 1849) (admonishing that "courts of justice [must] take care

46

. . . that hard cases do not make bad law").

Nor can the court's decision be justified simply

because the district judge rendered it under the rubric of equity

and in "[t]he interests of justice." Dopp III, 831 F. Supp. at

958. While it is true that equity occupies an honored place in

the jurisprudence of Puerto Rico, judges may assume the role of

chancellors only in the absence of a governing rule of positive

law. See P.R. Laws Ann. tit. 31, 7 (1967 & Supp. 1989)

(ordaining that "[w]hen there is no statute applicable to the

case at issue, the court shall decide in accordance with

equity"). Here, there is an apposite statute, and, therefore,

the district court's use of equitable principles to trump that

statute is legally indefensible.

We need go no further.24 Because the rights and

obligations of Pritzker and Yari, inter sese, must be determined

in accordance with the provisions of article 1425, unembellished

by freeform concepts of equity, the halving of Pritzker's

redemptive rights must be reversed.

IV. CONCLUSION IV. CONCLUSION

We succinctly summarize our conclusions. First, the

district court appropriately exercised in personam jurisdiction

over BPC. Second, the court correctly ruled that the three



24Because Pritzker is entitled to redeem Yari's entire
interest in the proceeds of the D/P Litigation (whatever that
interest may be), there is no need to inquire into the district
court's disposition of Yari's cross-claim against Dopp seeking a
declaration, inter alia, that Yari is entitled to "[all] the
rights created in his favor under the [financing] Agreement."

47

financing agreements involved litigated credits within the

meaning of article 1425. Third, we hold that Pritzker's

redemption efforts were both timeous and methodologically proper.

Fourth, we hold that the district court lacked the authority to

limit Pritzker's redemptive right to one-half of Yari's litigated

credit.

The district court's judgment in respect to Pritzker's

civil action is affirmed in part and reversed in part. The

district court is directed to enter an amended judgment

accordingly, when and as appropriate. Costs shall be taxed in

favor of Pritzker.

48